Abu CHOWDHURY, Plaintiff,

v.

MARATHON OIL COMPANY, Defendant.

No. 95 C 0805.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 16, 1997.

Thomas Flannigan, Law Offices of Thomas Flannigan, Chicago, IL, for Plaintiff.

Ronald W. Teeple, John L. Leonard, Jennifer A. Lazewski, Defrees & Fiske, Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

MORTON DENLOW, United States Magistrate Judge.

Plaintiff, Abu Chowdhury (hereinafter "Chowdhury") brings a third amended complaint in two counts against defendant Marathon Oil Company (hereinafter "Marathon"). On January 11, 1996 this Court granted Marathon's motion to dismiss the antitrust claim in the second amended complaint. *See Chowdhury v. Marathon Oil Company,* 1996 WL 19584 (N.D.Ill.1996). Plaintiff has now dropped his antitrust claims. Count I alleges that Marathon's decision denying Chow-

dhury a franchise was based on his race, religion, and national origin in violation of 42 U.S.C. § 1981 and 1982. Count II is a state law claim alleging that Marathon tortiously interfered with Chowdhury's prospective economic advantage. For the reasons set forth below the Court grants Marathon's motion for summary judgment as to both counts.

## I. BACKGROUND FACTS

Marathon markets branded gasoline to the public through (1) lessee-dealers (Marathon owns or leases the real estate, and leases the property to independent dealers), (2) sellers (who own the real estate), (3) and jobbers (who typically own or lease numerous retail locations). (Defendant's Rule 12 M Statement of Material Facts ("12 M") ¶¶ 5 and 6).

In 1994, Charles Stronach ("Stronach") was operating a car wash, gas station and food mart at 701 N. Independence, Romeoville, Illinois ("Romeoville Station") as a lessee-dealer of Marathon. The land at the Romeoville Station was owned by Marathon and was leased to Stronach by Marathon. The Service Station Lease ("Lease") between Stronach and Marathon, dated December 10, 1992, was for a three-year term from April 1, 1993 to March 31, 1996. The Lease contained the following provision:

[¶ 13] B. Assignment. Lessee agrees not to assign, mortgage, pledge or otherwise transfer, voluntarily or by operation of law, this Lease or sublet the Premises or any part thereof, without the prior written consent of Marathon.

Stronach was authorized by Marathon to operate the business as a Marathon branded unit. (12 M ¶¶ 7–11).

On or about May 4, 1994, Chowdhury entered into a written Agreement for Transfer of Assets ("Agreement") with Stronach to purchase the Romeoville station. The agreement between Chowdhury and Stronach provided for the payment of $5,000 down, $35,000 at closing and an additional $50,000 payable over five years. The Agreement between Chowdhury and Stronach included the following conditions:

WHEREAS, the property on which the Business is located is owned by Marathon

Petroleum and currently leased to Seller. This purchase will be conditioned upon Purchaser obtaining a lease for the Property and approval as a franchisee from Marathon Petroleum.

16. Conditions of Agreement. The parties agree that this Agreement is expressly contingent upon the occurrence of the following:

f. Purchaser obtaining, by the date of closing, a lease for the Business premises from Marathon Petroleum on terms and conditions acceptable to Purchaser. If Purchaser does not obtain said lease by that date, this Agreement is voidable by Purchaser or seller, upon written notice to the other, and all money paid by Purchaser shall be returned.

g. Purchaser obtaining, by the date of closing approval as a franchisee from Marathon Petroleum on terms and conditions acceptable to Purchaser. If Purchaser does not obtain said approval by that date, this Agreement is voidable by Purchaser or Seller, upon written notice to the other, and all money paid by Purchaser shall be returned.

However, Chowdhury was not granted the Romeoville Marathon station and his Agreement with Stronach was voided. Instead, Stronach sold his business assets and the balance of his lease to Marathon in exchange for an initial payment of $81,000 and an additional $9,000 one year later. (12 M ¶¶ 12–20). Marathon purchased the station in order to continue the business as a Marathon owned and controlled operation.

Emro, a wholly owned subsidiary of Marathon Oil Company, looks out for and acquires real estate suitable for the operation of Speedway Stations. In that regard, it looks for properties capable of generating a high volume of gasoline and convenience store sales and profits for Emro. One of the potential sources of such real estate suitable for the operation of Speedway Stations is real estate owned by Marathon Oil Company, the parent company of Emro Marketing Company. If a lessee-dealer of Marathon decides voluntarily to give up the station property, Marathon will then bring such properties to Emro's attention, as being properties poten-

tially available to Emro for the operation of Speedway Stations. (12 M ¶¶ 37–38).

When a Marathon property becomes available for possible acquisition by Emro, Gary E. Buroker ("Buroker"), the Senior Vice President, Operations, of Emro Marketing Company, confers with Edward S. Markel ("Markel"), the Manager of the Brand Division of Marathon Oil Company. Markel and Buroker, with input from economic analysts employed by Marathon and Emro, confer and consider whether it is in the best economic interests of Marathon and Emro to pursue one of the following options: (1) continue to operate the station as a Marathon branded location, (2) convey the property to Emro for operation as a Speedway location, or (3) sell the property to a third party. When Markel and Buroker confer about and consider particular pieces of property, their focus and goal is to maximize the return on investment for Marathon and Emro. Such real estate parcels are corporate assets, and Buroker and Markel decide on the disposition of such properties in such a way as to maximize the return on investment for Marathon and Emro. (12 M ¶¶ 39–41).

In or around May 31, 1994, Markel brought to Buroker's attention that Marathon unit # 2519 located at 701 North Independence, Romeoville, Illinois would be available for possible acquisition by Emro. Buroker thereupon wrote a letter on May 31, 1994 to Markel expressing Emro's possible interest in acquiring this unit. Buroker subsequently ordered his staff to prepare an economic analysis for him as to Emro's acquiring this unit and operating the property as a Speedway Station. A follow-up analysis was prepared for Markel by his staff dated July 14, 1994, comparing the economics of (1) continuing to operate this station as a Marathon brand location, (2) operating this station as a Speedway Station, or (3) selling the station to a third party. Marathon and Emro decided that the option which appeared to maximize return on investment was to convey this property to Emro for operation as a Speedway Station. (12 M ¶¶ 42–46).

Based upon the foregoing decision, Marathon conveyed the Romeoville Station to

Emro. Emro then demolished the existing structures at the Romeoville Station, including the underground storage tanks, and totally rebuilt the facility as a new Speedway location. Emro expended over $600,000 in the demolition and rebuilding. In or around June 1995, a new Speedway Station commenced operation on the Romeoville Station site. The new Speedway Station has been generating monthly gallonage gasoline sales of approximately 203,000. When operating as a Marathon brand location, the Romeoville Station had been generating monthly gallonage sales of approximately 75,000. (12 M ¶¶ 47–51).

On February 9, 1996, Chowdhury filed his third amended complaint against Marathon claiming (1) unlawful race discrimination based on his Bengali ancestry, and (2) tortious interference with prospective business advantage.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *Celotex Corporation v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

When reviewing the record on summary judgment, the court must draw all reasonable inferences in the light most favorable to the nonmovant. *Hill v. Burrell Communications Group, Inc.*, 67 F.3d 665, 667 (7th Cir.1995). To avert summary judgment, however, plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A dispute about a material fact is genuine only if the evidence presented is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A summary judgment proceeding is not a vehicle for the resolution of factual disputes; it is designed to determine whether there is any material dispute of fact that requires a trial. *Id.* If no reasonable jury could find for the party opposing the motion, it must be granted. *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995).

## III. DISCUSSION

The Court will discuss the evidence and draw all inferences in the light most favorable to the plaintiff. Such a discussion should not be deemed to indicate that plaintiff will ultimately prevail, or that the Court believes that all of the evidence presented is necessarily credible, but rather that under the standards for summary judgment, such an examination of the facts is required. Marathon moves for summary judgment on both counts of the third amended complaint and the Court will discuss each count in turn.

### A. Count I—42 U.S.C. §§ 1981 & 1982.

■ In the absence of direct evidence of discrimination, a plaintiff in section 1981 and 1982 actions must invoke the burden-shifting method outlined in *McDonnell Douglas Corp., v. Green* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Pilditch v. Board of Educ. Of City of Chicago*, 3 F.3d 1113 (7th Cir.1993). The now familiar *McDonnell Douglas* burden shifting test requires Chowdhury to establish a prima facie case of race discrimination. Establishing a prima facie case shifts the burden to Marathon to articulate a legitimate non-discriminatory reason for their actions. *Id*

If the defendant succeeds in carrying its burden of production, the legal presumption dissolves and the *McDonnell Douglas* shifting-burden framework is no longer relevant. *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1122 (7th Cir.1994). Throughout the process "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407, (1993). However, for summary judgment purposes, a nonmoving plaintiff at the last

step of the *McDonnell Douglas* framework bears a burden lighter than one of demonstrating "that the reasons are a mere pretext." A nonmoving plaintiff need only produce evidence from which a rational fact finder could infer that the defendant's proffered reasons are not worthy of credence. *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1124 (7th Cir.1994.)

For purposes of this motion, Marathon concedes that Chowdhury has established a prima facie case of discrimination. However, Marathon argues that Chowdhury is unable to show that the legitimate non-discriminatory reason given by Marathon to justify its actions is merely a pretext for discrimination or unworthy of credence.

Marathon has articulated a legitimate non-discriminatory reason for denying Chowdhury a franchise. Marathon and its subsidiary Emro decided that it was in the best economic interest of the companies for Emro to take over the property and build and operate a new Speedway Station in place of the Marathon dealership located in Romeoville, Illinois. Emro expended over $600,000 on this project, and the new Speedway Station is selling approximately 125,000 gallons of gasoline more per month than the previous Marathon branded station.

Chowdhury has failed to show that Marathon's articulated reason is pretexual. Chowdhury advances several arguments as to why Marathon's reason is pretextual. First, Chowdhury argues that there is a "timing" problem with the preparation of the economic analysis upon which Marathon based its decision to erect a new Speedway Station. Chowdhury states that he was denied the franchise on or about June 29, 1994, and Buroker testified that as of July 14, 1994, Emro had not completed reviewing the economic factors relating to the building of the new Speedway. Chowdhury argues that if the real reason for denying him the franchise was the economic analysis, Marathon would have waited until its completion before voiding the agreement between Stronach and Chowdhury. However, Gary E. Buroker, Senior Vice President, Operations, of Emro Marketing Company testified that it was possible that a decision could have been reached prior to July 14, 1994. (Buroker Dep. pgs. 84–85). When asked whether a decision could have been made prior to July 14, 1994, Buroker testified that:

> Yes, that is very possible, because any time after I would have the economics from my analyst, any time he had his, those are shared between the two groups, and we can talk about that information prior to it coming to this form, which puts the two together. So yes, we could have talked about it and made a decision before July 14th.

*Id.* Chowdhury has neither presented any evidence to refute the testimony of Mr. Buroker nor raised a genuine issue of material fact with respect to the preparation of the economic analysis and the decision to build a new station.

■ Second, Chowdhury advances several arguments that he was treated differently from previous and prospective franchise owners. He argues that Stronach, the previous owner of the Romeoville station, was not required to submit the amount of paperwork and security which Marathon requested from him. The problem with Plaintiff's argument is that the difference in treatment between Stronach and Chowdhury has no bearing on his claim. Stronach was not chosen instead of Chowdhury, but rather Marathon decided to convert the operation to a company owned Speedway station. Also, as Defendant points out, Stronach applied for a franchise ten years earlier than Chowdhury and it is likely that the application procedures for a franchise could have changed. The difference in treatment of prospective franchisees some ten years apart does not rise to the level of discrimination.

■ Chowdhury also complains of the fact that Mr. Robert Dickman, a Marathon marketing representative, sought to recruit someone else for the Romeoville Marathon prior to Marathon deciding to run the station. Chowdhury claims that it is "odd" that Marathon would attempt to recruit Terry Lambert, a white male that currently operates an Amoco service station in Romeoville, as a candidate for the Marathon dealership when Chowdhury was already available as a

candidate. However, Mr. Dickman testified that:

> ... my job is to make sure I have the best candidate, and even though I have a good prospect, until I am told that it's time to make a decision on a candidate, I will continue to interview other potential candidates.

(Dickman Dep. pg. 30). The practice of soliciting candidates for a franchise while another candidate has an application on file, in and of itself, does not constitute discrimination. If Mr. Lambert received the franchise or some favorable treatment Chowdhury may have a claim, however, simply because Dickman contacted other candidates does not subject Marathon to liability for discrimination.

■ Next, Chowdhury claims that comments made by Stronach and Gayes are indicia of Marathon's discriminatory intent and are sufficient to show pretext. Chowdhury states that Steven Gayes, a Marathon marketing representative, told him to "[s]tay away from the [Removal station], [Marathon] wants to turn it into a company op. You are fighting a losing war. And you can see around there is not much of a minority people in Marathon." (Chowdhury Dep. pgs. 161–163). However, Gayes testified that he is aware of some jobbers that are of Indian descent. Also, Marathon has produced as an exhibit a list of lessee-dealers that are arguably members of a minority racial group. Chowdhury's testimony shows that even prior to denying him a franchise, Marathon was considering converting the station into a Speedway and was attempting to save Chowdhury time and money in pursuing a franchise in Romeoville. Most importantly, Gayes was not involved in the decision to convert the site to a Speedway station. *Smith v. Firestone Tire & Rubber Co.,* 875 F.2d 1325, 1330 (7th Cir.1989); *LaMontagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1412 (7th Cir.1984).

■ Chowdhury further claims that when Stronach was asked whether Chowdhury's race could have played a part in Marathon's decision denying Chowdhury a franchise he testified that "It's not impossible." This statement is insufficient to raise a fact question that Marathon's articulated reason is a pretext for discrimination. Stronach is not a Marathon employee and had no involvement in the decision made by Marathon to buy out the lease and operate the facility as a Speedway station. Chowdhury simply has not produced evidence which would convince a reasonable fact finder that Marathon did not believe it could operate a more profitable gas station. More importantly though, to be probative of discrimination, isolated comments must be contemporaneous with the alleged wrongful conduct or causally related to the decision making process of the alleged wrongful conduct. *Holly–Anne Geier v. Medtronic, Inc.,* 99 F.3d 238, 242 (7th Cir. 1996). Stronach's comment was neither contemporaneous with nor uttered by a Marathon employee responsible for denying Chowdhury a franchise.

■ Finally, Chowdhury argues that Marathon's articulated reason for its actions is pretextual because it amounts to bad business judgment. Chowdhury has not produced any evidence that directly or indirectly challenges Marathon's reasons as being unworthy of credence. Instead Chowdhury argues that the peculiar business practices of Marathon and Emro would allow a reasonable jury to find in their favor. As has been clearly stated by the Seventh Circuit, "the issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers." *McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir.1992). The Court finds that Chowdhury has not brought forth sufficient evidence to raise a question of fact that the reasons given to convert the Romeoville station from a Marathon lessee-dealer operation to a company owned Speedway operation were a pretext. Therefore, Marathon's motion for summary judgment as to Count I is hereby granted.

## B. Count II—Tortious Interference With An Economic Advantage

In Count II Chowdhury alleges that Marathon intentionally interfered with his business relationship with Stronach by not ap-

 

proving the sales agreement for the sale of the Romeoville station. For the reasons stated below the Court finds that Marathon did not tortiously interfere with Chowdhury's business relationship and was merely protecting its own financial interests. Therefore, summary judgment is granted as to Count II.

The elements of a claim for tortious interference with prospective economic advantage are: 1) the plaintiff has a reasonable expectation of entering into a valid business relationship; 2) the defendant has knowledge of the plaintiff's expectancy; 3) the defendant purposefully interferes in such a way as to prevent that expectancy from being fulfilled; and 4) the plaintiff suffers damages as a result of the defendant's interference. *Delloma v. Consolidation Coal Co.*, 996 F.2d 168, 170–71 (7th Cir.1993). The right to enter into a business relationship is not as rigidly protected as the right to receive the greater protection of that right. *Belden Corp. v. InterNorth, Inc.*, 90 Ill.App.3d 547, 45 Ill. Dec. 765, 769, 413 N.E.2d 98, 102 (1st Dist. 1980).

Marathon's decision to retain ownership of the Romeoville station does not amount to tortious interference because Marathon was seeking to protect its own existing economic interest. Chowdhury has presented no evidence which would lead a rational fact finder to conclude that Marathon intentionally interfered with Chowdhury's business relationship to inflict harm. Instead, Marathon decided that it would be more profitable for the shareholders of Emro and Marathon if the franchise was retained by the company, something Marathon had every right to do. "[O]ne who has an interest may take action to protect his rights, and even if the interference is done with malice he cannot be held financially liable for the result of his actions." *Petit v. Cuneo*, 290 Ill.App. 16, 7 N.E.2d 774, 777 (1937). Also, no authority demonstrates that "intended but purely incidental interference resulting from the pursuit of the defendant's own ends by proper means has been held to be actionable." (Prosser, Law of Torts § 130, at 952 (4th ed.1971)).

## IV. CONCLUSION

For the foregoing reasons, **Marathon Oil Company's motion for summary judgment is hereby GRANTED** as to plaintiff's third amended complaint.

**SO ORDERED.**